Johannes V. HOEBER et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY et al., Defendants.

L'ENFANT PLAZA PROPERTIES, INC. et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY et al., Defendants.

Civ. A. Nos. 74–733, 74–959.

United States District Court, District of Columbia, Civil Division.

Jan. 9, 1980.

See also 184 U.S.App.D.C. 30, 564 F.2d 515 and 412 F.Supp. 211.

1358

Arthur H. Berndtson, for Hoeber plaintiffs.

Kenneth W. Parkinson, David H. Cox, for L'Enfant Plaza plaintiffs.

Harry R. McPhee, for Reporters Bld., plaintiff.

B. Michael Rauh, Martin Shulman, Manglen Corporation, defendant intervenors Landis, Cohen, Singman & Rauh.

William C. Tayler, Kenneth Ingram, Marianne K. Renjilian, Harbor Square, plaintiff intervenors Sachs, Greenbaum & Tayler.

## OPINION

HAROLD H. GREENE, District Judge.

These actions for declaratory and injunctive relief involve the question whether per-

sons who have made investments in an urban renewal area under a government-sponsored redevelopment plan may block subsequent plan modifications which would adversely affect their interests and properties. Specifically, the plaintiffs in this case object and refuse to give their consents to proposed changes in the redevelopment plan for Southwest Washington which would substitute low income housing for church use on one parcel of land and would permit a motel to expand in size and height on another parcel.

There are four sets of plaintiffs and two sets of defendants. Plaintiff L'Enfant Plaza Properties, Inc. (L'Enfant Plaza) is a tenant under a long-term lease of premises in the Southwest urban renewal area which contain office space, a commercial shopping area, a theatre, a hotel, and underground parking.[1] The Hoeber plaintiffs[2] are owners of townhouses in the urban renewal area who obtained title to their properties from redevelopers who, in turn, had acquired such title from the Redevelopment Land Agency. Plaintiff Reporters Building, Inc. owns and operates an office building containing commercial space in the same area.[3] Intervenor-plaintiff Harbour Square Owners, Inc., is a non-profit cooperative housing corporation which owns a development in the area consisting of single-family and multi-family houses.[4]

Named as defendants are several governmental entities and individuals, including the National Capital Planning Commission (NCPC) which adopts urban renewal plans and modifications, the District of Columbia Council (City Council) which approves these plans or modifications, and the Redevelop-

ment Land Agency (RLA) which is responsible for implementation of the plans. The other principal defendant is Manglen Limited Partnership (Manglen), an intervenor, which developed property in the Southwest area upon which the Channel Inn, a motel and restaurant, is located.

I

On August 2, 1946, after several years of planning and the introduction of several bills in the Senate, Congress enacted the District of Columbia Redevelopment Act of 1945, D.C.Code § 5–701 et seq., 60 Stat. 790, which authorized a program of urban renewal for the District of Columbia and established a framework for its implementation.[5]

The statute was adopted pursuant to a legislative determination that conditions in the District of Columbia (including substandard housing and blighted areas) were injurious to the public health, safety, morals, and welfare of its residents, and that it was the policy of the United States to protect and promote the well-being of its citizens by eliminating these conditions. Congress further determined that control by regulatory processes had failed to remedy the existing problems and that the acquisition of property was necessary to effectuate the declared policy.

An elaborate and detailed scheme was prescribed in the statute to carry out this urban renewal program.

Section 705(a) of the Act vests a planning function in the National Capital Planning Commission and grants to that agency the authority to adopt redevelopment plans for

---

1. L'Enfant Plaza acquired the lease for these premises from the Redevelopment Land Agency on November 24, 1965.

2. Johannes V. Hoeber is one of 49 homeowners in the Town Square development all of whom are plaintiffs herein.

3. The Reporters Building purchased its property from RLA in 1965 pursuant to the Redevelopment Act. Plaintiffs CSA Reporting Corporation and Robert H. Smith t/a Robert Associates also represent the interests of the Reporters Building, a joint venture, in this litigation.

4. Originally, two separate actions were brought by the parties; C.A. 74–733 by the Hoeber plaintiffs, and C.A. 74–959 by L'Enfant Plaza and the remaining plaintiffs. The Court ordered the actions consolidated on August 4, 1974.

5. See *Berman v. Parker*, 348 U.S. 26, 28, 75 S.Ct. 98, 99 L.Ed. 27 (1954) for a general discussion of the policy underlying the Act.

specific project areas,[6] subject to the approval of the City Council.[7] Under this authority, the NCPC has the power to prescribe the public and private land uses for the respective areas, density standards for both population and buildings, and the amount and character of any low-rent housing. Section 705(b)(2). Following City Council approval, the NCPC certifies the plan to the RLA which then acquires and assembles real property in the area[8] and transfers it to public agencies (for use for such public purposes as streets, utilities, recreation facilities, and schools) and to redevelopment companies (for lease or sale of the remainder). Section 706(d). The Act directs the RLA to give preference to private enterprise over public agencies in executing the redevelopment plan. Section 706(f).

To insure compliance with the renewal plan, Congress specified that all lease and sales agreements shall contain clauses binding the lessees or purchasers to carry out the plan and that use of all property shall conform to the plan. Section 710–11. The Act establishes procedures for modification of redevelopment plans by the NCPC, and it provides in section 718 that neither the federal nor the District government may modify an approved redevelopment plan or deviate therefrom unless the change is either adopted in accordance with the procedures set forth in section 711 or prescribed by an Act of Congress.

This litigation has from its very inception centered on the "consent" clause of section 711 which provides as follows:

6. The Act defines "project area" as an appropriate unit of redevelopment planning separate from redevelopment projects for other parts of the District of Columbia. The NCPC has authority to delineate project areas.

7. Originally, the urban renewal plan was subject to the approval of the District of Columbia Board of Commissioners, but the approving function was later vested in the City Council pursuant to Reorg. Plan. No. 3 of 1967, § 402 (122), D.C.Code Tit. 1, App. (1973).

8. The Act authorizes the RLA to acquire property for a redevelopment plan by "purchase,

An approved project area redevelopment plan may be modified at any time or times: Provided, *That any such modification as it may affect an area or part thereof which has been sold or leased shall not become effective without the consent in writing of the purchaser or lessee thereof:* Provided further, That such modification may be effected only through adoption by the [National Capital] Planning Commission and subsequent submission to and approval by the [District of Columbia Council,] as hereinafter provided. Before approval, the [District Council] shall hold a public hearing on the proposed modification after ten days public notice (emphasis added).[9]

II

On April 5, 1956, the NCPC adopted the Urban Renewal Plan for Southwest Urban Renewal Project, Area C,[10] and the Board of Commissioners of the District of Columbia approved the plan on November 30, 1956.[11] Area C covers an area of approximately 442 acres, extending roughly from Independence Avenue in the north to Fort McNair in the south and from 3rd and 4th Streets in the east to the Washington Channel and 14th Street in the west. Together with the Area B redevelopment project, it covers most of the Southwest section of the District of Columbia.

When Area C was first earmarked for redevelopment, a plan was submitted by Elbert Peets, an NCPC staffer, which would have limited redevelopment to the rehabilitation of existing buildings on the premise that Southwest would remain a low

exchange, gift, dedication or eminent domain . . ." Section 704.

9. The Area C redevelopment plan itself incorporates identical language.

10. Area C is one of eleven urban renewal projects in the District of Columbia.

11. The plan is recorded in the Office of the Recorder of Deeds of the District of Columbia in Liber 10805, Folio 209. By its terms it will terminate in 1996, sixteen years from now.

income area. The NCPC was not satisfied with this concept. In its view, the area had a "higher potential;" and the Commission therefore opted for a plan developed by architects Cloethiel Woodard Smith and Louis Justement which was based on a "new town in the city" concept. That plan envisioned the development of Southwest Washington as a major physical and economic asset to the nation's capital, and it provided for new and varied uses within Area C, including single-family homes, apartment buildings, restaurants, marinas, and other, similar facilities.[12] It was this plan which, with some changes, was officially adopted for Area C in 1956.

After its adoption, the plan over the years underwent a number of amendments or modifications. The two modifications which are at issue here were proposed by the defendants in 1974 and objected to by plaintiffs shortly thereafter.

Modification 22 would change the use of Parcel 76[13] from church or semi-public use to low or moderate income housing.[14] Modification 23 would affect Sites D–1 and D–2

by permitting addition of 50 motel units to the existing Channel Inn and an increase in its building height limitations.[15] In adopting[16] the plan changes for both Parcel 76 and Sites D–1 and D–2,[17] RLA took the position that the plaintiffs' written consents were not required under the Act, and neither that agency nor the NCPC or the Council requested or obtained consents from any of the plaintiffs.

Plaintiffs initiated these actions on May 15, 1974, and June 25, 1974, respectively, requesting a declaratory judgment that under section 711 the proposed modifications to the plan may not be effected without their written consents, and an injunction prohibiting implementation of such modifications. It is plaintiffs' basic claim that the statute requires the RLA to obtain the consent of landowners or lessees who are substantially and adversely affected by a proposed modification even if such an effect is only "indirect." Defendants assert that the statute requires them to seek only the consent of landowners "directly" affected by a modification.[18] It is that difference of

12. The plan provides detailed density controls, establishing maximum numbers of dwelling units per acre. Low income housing is also included in the plan, and some 5,000 low income individuals are residing in the adjacent Area B redevelopment area.

13. Parcel 76 is bounded by the Southwest Expressway on the north, G Street on the south, 7th Street on the east, and 9th Street on the west. RLA owns Parcel 76 and is presently operating an open air parking lot on the land.

14. The original 1956 plan designated Parcel 76 for row houses, flats, and two or three story apartments. In 1963, Modification 5 redesignated Parcel 76 for semi-public or church use. Plaintiffs in this action leased or purchased their properties after the date of this amendment.

15. Sites D–1 and D–2 are located between Water Street and the Washington Channel.

16. When Modification 22 was proposed, the City Council's Housing and Urban Renewal Committee held several public hearings at which these plaintiffs objected to the proposed modification. Nevertheless, the City Council approved the modification. The City Council also held a public hearing on Modification 23, but plaintiffs did not oppose this amendment at

the hearing. However, they had previously requested that their written consents be sought with respect to any modification of Sites D–1 and D–2 which might affect their interests.

17. Sites D–1 and D–2 had previously been the subject of a proposed modification by NCPC. In 1967, NCPC proposed to modify the plan by increasing the permitted number of transient lodging units on the sites from 50–60 to 150 units. Plaintiffs here brought an action seeking a declaratory judgment on the correct interpretation of the modification provision of section 711 and an injunction to restrain implementation of the modification. NCPC thereupon withdrew the proposed modification and this Court dismissed plaintiffs' action as moot. The U.S. Court of Appeals affirmed on this aspect of the case. *L'Enfant Plaza North, Inc. v. District of Columbia Redevelopment Land Agency*, 141 U.S.App.D.C. 265, 437 F.2d 698 (1970).

18. Throughout this litigation, the term "directly affected" has been considered by the parties and the Court to mean landowners on whose property actual physical changes are made as a result of a plan modification; and the term "indirectly affected" has been taken to mean landowners of property in the redevelopment area whose various interests are substantially affected by a plan change even though the

views which lies at the heart of the dispute between the parties.

## III

■ This case is before the Court on remand from the Court of Appeals.[19] In its opinion remanding the case for trial, the Court of Appeals noted that the Act is ambiguous on the issue of whether the RLA must obtain the consent of indirectly affected landowners as a prerequisite to implementation of an area plan modification. It

physical alterations occur on other land in the area. The same terminology will be used herein.

19. The case was on appeal from this Court's grant of summary judgment to the defendants. The Court (Jones, J.) had ruled that section 711 of the Act would be an unconstitutional, standardless delegation of legislative power were it to be construed to require the consent of lessees or purchasers to proposed modifications which indirectly affect them as a prerequisite to the implementation and approval of the change. The Court of Appeals reversed, finding the existence of material issues of fact. *L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency*, 184 U.S.App.D.C. 30, 564 F.2d 515 (1977).

20. While this Court has considered the legislative history of the statute, it has found nothing to contradict the view of the Court of Appeals that the history is inconclusive. The bill that was enacted as the Redevelopment Act was the result of a compromise between two prior bills, S. 13 and S. 610, 79th Cong., 1st Sess. 1–2 (1945). On the major distinction between the two bills, see *Low-Cost Housing in District of Columbia*: Hearings on S. 13 and S. 610 before a Subcomm. of the Senate Committee on the District of Columbia, 79th Cong., 1st Sess. (1945). Both parties focus on the language of these prior bills and assert that the changes made in the compromise bill ultimately enacted supports their interpretation of section 711.

Under both S. 13 and S. 610, only landowners who were directly affected had the right to object to proposed modifications.

S. 13 specifically provided that ". . . an approved project area redevelopment plan may be modified at any time or times; provided that any such modification as it may *directly* affect an area or part thereof which has been sold or leased shall not become effective without the consent in writing of the purchaser or lessee thereof . . . ." Cong. Rec., 79th Cong., 1st Sess., Vol. 91, p. 91–77 (January 6, 1945) (emphasis added).

S. 610, while omitting the word "directly," nevertheless made it clear through its phrasing

did not resolve the issue of statutory interpretation but directed this Court to decide that question on remand, after taking account of administrative practice under the statute, the possibility of an estoppel, and the legislative history of the Act.[20] The parties have also extensively briefed and argued, and the Court has considered, the public policy which underlies the statute.

In accordance with the appellate mandate, the Court will turn first to considera-

that only landowners who were directly affected must consent to proposed modifications (although others would receive notice). That bill provided that an "approved project area redevelopment plan may be modified at any time or times after the lease or sale of the area or part thereof provided that the modification be consented to by the lessee or purchaser . . . [but] before approval, the District Commissioners shall hold a public hearing on the proposed modification, notice of the time and place of which shall be given by mail sent at least ten days prior to the hearing to the then owners of the real properties in the project area and of the real properties immediately adjoining or across the street from the project area . . ." See Cong. Rec., 79th Cong., 1st Sess., Vol. 91, p. 91–78 (January 6, 1945).

In the compromise version of the bill the language "as it may affect" in S. 13 was inserted in place of "as it may directly affect," and plaintiffs claim that Congress intentionally omitted the word "directly," thus manifesting an intent that landowners subjected to some substantial effect should have the right to object to a proposed modification, even if the effect is only indirect. Omission of the word "directly" from the final version of the Act does not in itself indicate that Congress intended to cause a significant change in the meaning of the provision. See *Alexander v. U.S. Dept. of Housing and Urban Development*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 38 (1979). Beyond that, the Court of Appeals fully discussed the argument raised by plaintiffs in that regard and ultimately determined that no conclusive inference could be drawn one way or the other. The case was remanded in part to give the parties an opportunity to adduce additional legislative history to illuminate this point. However, neither party has been successful in doing so. This Court concludes, as did the Court of Appeals, that the legislative history would permit either the plaintiffs' or the defendants' interpretation of section 711.

tion of the RLA's administrative practice [21] with respect to the consent provision.

■ It is defendants' basic position that prior to 1968 (when the government adopted its present policy of not seeking consents) there was no considered or consistent administrative interpretation of section 711. The record does not bear out this contention. To be sure, prior to that time there existed neither a written policy nor a formal legal opinion or analysis of section 711.[22] However, it is equally clear that, in practice, the RLA construed section 711 as requiring the consent not only of developers who were directly affected by a proposed plan modification but also of those upon whom such a modification would have had an adverse indirect effect of substantial dimensions.

The first two executive directors of the RLA testified that they informed potential redevelopers that written consents would be secured from any redeveloper whose property was affected by the proposed modification of the existing Urban Renewal Plan.

According to these individuals, the RLA made its determination whether a redeveloper was affected by a proposed plan modification through intra-agency consultations between the executive director and his staff members. The RLA staff, in turn, determined whether a developer was affected within the meaning of section 711 by looking to the specific language of the proposed plan modification, its effect in ingress and egress, the impact of automobile traffic, the effect on light and air, changes in density of development, any increased economic competition, and any aesthetic effects, such as height changes and impact on the existing view of private redevelopers.

Numerous written consents were secured in conformity with this policy. Indeed, a written waiver was sought from and is contained in the lease between L'Enfant Plaza and RLA in which the former relinquishes its right to object to a plan modification pertaining to land outside L'Enfant Plaza's tract.[23] By requesting a waiver or securing a consent in that and other instances RLA implicitly recognized that landowners or

---

21. Although the Act does not designate RLA, NCPC, or any other entity as being responsible for obtaining consents from affected redevelopers, RLA's executive directors and their staffs assumed that responsibility and they were, in fact, the agents of the government for this purpose. Their practice is the only administrative practice in existence.

22. Phil A. Doyle, former RLA Executive Director, stated that RLA did not have any written procedures for plan modifications nor had he asked for a legal interpretation on the consent provision prior to 1967. The first written expression of RLA policy with respect to section 711 appeared in a letter from Neville Miller, Chairman of the RLA Board of Directors, to Daggett Howard, legal counsel for L'Enfant Plaza Properties, Inc., dated May 1, 1968. In that letter, Miller stated that the government attorneys interpreted section 711 as requiring only the consent of the purchasers and lessees of property that was the subject of the modification. Miller noted, however, that the RLA had applied a broader interpretation of the statute in practice, and had recognized that "some areas other than those directly involved in a plan modification could be 'affected' by the modification."

23. The waiver provision concerned a tract of property known as "the Overlook." The RLA anticipated a modification of the area plan to

allow construction of a commercial parking garage with a capacity of 2,700 motor vehicles under the Overlook and a commercial bridge linking the southwest waterfront area with East Potomac Park. The modification indirectly affected L'Enfant Plaza by creating adverse economic competition for the commercial parking permitted on the L'Enfant Plaza site. The waiver clause in the lease provided: "(c) *Overlook Garage and Ponte Vecchio.* The REDEVELOPER is aware that plans are being studied for the development of: (1) a parking garage with a maximum capacity of 2,700 motor vehicles beneath the OVERLOOK and, (2) a structure containing commercial uses bridging the Washington Channel to connect East Potomac Park and the southwest waterfront area at a point nearly adjacent to the OVERLOOK. In the event it shall be necessary to modify the URBAN RENEWAL PLAN to provide for the development of the aforementioned parking garage and commercial bridge, the REDEVELOPER, for the purposes of Title 5, District of Columbia Code (1961 Edition), Section 711, hereby waives his right to object to such modification of the URBAN RENEWAL PLAN as may be necessary to permit the development of the aforesaid garage and commercial bridge and any facilities necessary to serve these structures."

lessees who were only indirectly affected by a plan modification relating physically to another tract of land may be entitled to an objection before the modification may validly be approved.

The government, while acknowledging that consents were obtained from purchasers or lessees of property which was not the direct subject of a proposed plan modification, argues that the RLA policy in that regard was not consistent; that it should be given no weight because it constituted no more than a prudent, precautionary measure; and that in any event the policy was changed in 1968.

It is true that the RLA was not entirely consistent in its determinations of what constitutes an "effect" within the meaning of the law, and that on a number of occasions prior to 1968 it did not seek waivers or consents.[24] However, its practice of obtaining consents both from those directly and those indirectly affected by a plan modification during the period before 1968 was sufficiently sustained and advertised that it is appropriate to conclude that it was reflective of a deliberate contemporaneous construction of the statute by the agency.

The Court also rejects as unpersuasive the contention that the pre-1968 waivers and consents are meaningless in that they were no more than precautionary steps. A precautionary measure in that regard would have been unnecessary had not the RLA already developed an interpretation at odds with its present position and had not developers and purchasers been led to believe that they had a right to object to plan changes which affected them only indirectly. In any event, this after-the-fact rationalization cannot erase years of agency practice on an issue critical to resolution of this lawsuit.

In 1968, the RLA began to reverse this policy by attempting modifications of the Area C plan without the written consent of landowners who were indirectly affected.[25] It also initiated a policy of requiring new developers to forfeit by contract such rights as they might have under the law to consent to plan modifications in instances where the property was not directly the subject of the change.[26] The RLA's about-face with respect to the interpretation of section 711 occurred after a great many years of agency practice, far too late to be of substantial weight in the present context. Agency practice prior to 1968 was so entrenched that the Court concludes that it constituted the administrative interpretation for purposes of an ascertainment of the meaning of the statute.

■ This administrative practice is entitled to considerable weight in interpreting the statute because "[it] involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, [and] of making the parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The contemporaneous interpretation of a statute by the agency that is assigned to implement its provisions is accepted by the courts absent compelling indication that it is incorrect. *New York State Dep: of Social Services v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Power Reactor Development Co. v. Electrical Union*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Quern v. Mandley*, 436 U.S. 720, 738, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978); *Haviland v. Butz*, 177 U.S.App.D.C. 22, 543 F.2d 169 (1976); *United Shoe Workers of America AFL–CIO v. Bedell*, 165 U.S.App.D.C. 113, 506 F.2d 174 (1974); *Lenkin v. District of Columbia*, 149

---

**24.** While it is not possible to develop a wholly coherent pattern, it appears that in many instances consents were not sought where the indirect effects would have been insubstantial or not adverse.

**25.** When challenged through litigation, the RLA rescinded its adoption of a plan modifica-

tion to which consents had not been secured. See note 17, *supra*.

**26.** From May 27, 1968, to June 29, 1972, every land disposition contract contained a waiver of the statutory right to withhold consent to plan modifications not directly affecting a developer's property.

U.S.App.D.C. 129, 141, 461 F.2d 1215, 1227 (1972); *Lange v. United States*, 143 U.S. App.D.C. 305, 309, 443 F.2d 720, 724 (1971). Not only is there no compelling indication that the early administrative interpretation of section 711 is erroneous, but as discussed below, that interpretation is also supported both by equitable estoppel principles and by the policy underlying the statute.[27]

## IV

▮ The same actions of the RLA which support the conclusion that the Act should be construed consistently with the way it was administered during the early years of its life also suggest that defendants should be estopped by equitable principles from modifying their prior interpretation of the consent provisions of section 711.[28]

All of the elements of an estoppel[29] —false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance—are present here. In negotiating the sale and lease of plaintiffs' properties, representatives of the RLA represented that section 711 required the consent of landowners and lessees who would be indirectly affected by a proposed plan modification.[30] Several witnesses testified without substantial contradiction that plaintiffs did not know that the statute might have a different meaning.[31] And there also was credible testimony that plaintiffs relied on the representations of RLA's agents.[32]

In the view of these factors and the history related in Part III, *supra*, the only objection raised by defendants to plaintiffs' es-

toppel argument that deserves extended consideration is that the doctrine may not be invoked against the government.

In *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the leading case on estoppel against the government, a local committee of the agency had advised the plaintiff that his crop was insurable under its program, contrary to regulations published in the Federal Register. Based on the regulations, the agency refused to compensate the Merrills when a loss occurred. The Supreme Court held that the government was not estopped from denying liability based on the statement of the local agent because the Merrills were held to have had constructive notice of the published regulations. Said the Court: "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." 332 U.S. at 384, 68 S.Ct. at 3.

It is generally agreed that, to the extent that *Merrill* had been thought to have established a ban on the use of estoppel against the government, that concept was undermined by the later case of *Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951). There, a Swiss national had applied for exemption from military service after he had been advised by the State Department that by doing so he would not forfeit any right to citizenship in the future. The Court held that the government could not deny the plaintiff his right to apply for citizenship because it had

---

27. As indicated *supra*, note 20, that interpretation is not contradicted by the legislative history.

28. The Court of Appeals considered but did not come to a definitive conclusion on the estoppel issue.

29. See *United States v. Georgia-Pacific Company*, 421 F.2d 92 (9th Cir. 1970).

30. In so doing, these representatives were acting within the scope of their authority. Compare *Federal Crop Insurance v. Merrill, infra.*

31. In view of the representations made by the agents of the government it would be unreasonable to place on plaintiffs the burden to speculate at their peril that a court might conceivably come to a different conclusion fifteen years later.

32. Plaintiffs carefully consulted with the RLA prior to investing in Area C.

misled him and he had not knowingly waived his rights to citizenship. Although the Court did not expressly mention *Merrill* or label its decision as being based on estoppel, it effectively relied on estoppel principles in its holding that the government could not disavow its previous actions.

Both the textwriters and the lower courts have so construed *Moser*. See 2 K. Davis, Administrative Law Text, § 17.02, pp. 345–46; *United States v. Lazy F.C. Ranch*, 481 F.2d 985 (9th Cir. 1973) (erroneous advice by agent of the Department of Agriculture concerning payment limitations under soil bank program); *United States v. Wharton*, 514 F.2d 406 (10th Cir. 1975) (family protected from loss of home resulting from erroneous advice given by government agency); cf. *Brandt v. Hickel*, 427 F.2d 53 (9th Cir. 1970) (government estopped from disavowing its advice to applicants for oil and gas leases that they would not lose their priority upon refiling corrected applications); *Schuster v. C.I.R.*, 321 F.2d 311 (9th Cir. 1962) (tax commissioner estopped from holding trustee liable on tax deficiency after advising him that certain assets of estate were not taxable).

As these cases teach, an estoppel against the government requires, in addition to the traditional factors, a showing of an injustice to the party asserting the estoppel and lack of undue damage to the public interest. As discussed in detail in Part V *infra*, not only would serious injustice result if the government were allowed to reverse its interpretation of the statute after private developers had invested very large amounts of capital in reliance thereon, but such a reversal would not be in the public interest.

## V

██ A statute should, if possible, be construed in accordance with its over-all purpose and with the public policy which it is intended to promote. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The purpose of Congress in passing the Redevelopment Act of 1946 was to redevelop blighted areas of the District of Columbia. In embarking upon this program, Congress as well as the District recognized that the redevelopment task was so enormous that the contribution and cooperation of private developers would be necessary.[33] When they began the planning process, NCPC and RLA quickly found that it was difficult to persuade private redevelopers to risk significant amounts of capital in the Southwest urban renewal area because of the prevalent view that Southwest was a slum, would probably remain a low income area even after renewal, and might revert to its earlier run-down status.

It was to counteract that widespread impression that the two agencies proposed to do more than to renovate existing structures but decided boldly to change the very image of the area by adopting the ambitious "new town in the city" concept.[34] If this concept was to succeed, private capital had to be attracted in massive amounts, and that, in turn, could be accomplished only if potential investors were assured that the renewal plan was stable and their investments protected from subsequent government action having the effect of undermining the "new town" concept.

---

**33.** Defendants' suggestion (Proposed Findings, p. 6) that "private interests seeking to maximize profits called on government to assist them" conveys a false impression of what actually occurred. The initiative was the government's, and it made the crucial decisions.

**34.** In this respect, they were reflecting the intent of the statute. As Mr. Justice Douglas emphasized in his opinion for the Court in *Berman v. Parker, supra*, upholding the constitutionality of the statute, the purpose of the redevelopment of Southwest Washington was

to redesign the area "so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping areas. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented. . . . Such diversification in future use is plainly relevant to the maintenance of the desired housing standards and therefore within congressional power." 348 U.S. at 34–35, 75 S.Ct. at 103–104.

Section 711 [35] was enacted with these principles in mind, and the assurances the RLA gave to potential investors implemented these same considerations. The purpose of the section 711 proviso was to protect and thus to attract private developers by means of a guarantee that the plan could not be modified against the will of those whose land would be significantly affected by proposed modification. It was intended to secure a reliable urban renewal plan which would encourage redevelopers to enter and risk capital in the transformation of what was then a severely blighted area.[36]

The congressional and planning concepts succeeded brilliantly. By 1973, over $265 million had been invested in the Southwest redevelopment area by private developers,[37] compared to less than $230 million of government expenditures of all types, and there can be no doubt that the assurances of stability were the major inducement in attracting that capital.

Yet it is obvious that, if the promise of reliability of the plan is to be carried out, the right to object to a proposed modification must extend to those who, within the meaning in which that term is used here (see note 18), are "indirectly" affected by the change. Changes need not physically occur on a landowner's property to have a substantial and adverse effect upon him, the value of his property, or the stability of his investment. To cite somewhat extreme examples, the establishment of stockyards, a fertilizer plant, or a penitentiary would surely significantly affect many landowners in the area—not merely those whose realty is taken for the construction itself. The same is true, albeit to a lesser degree, with respect to other substantial plan changes.[38]

Thus, if the "reassurance" purpose of section 711 is to have any real meaning, it must extend its protection to those landowners, whether directly or indirectly affected, who would be subjected to substantial adverse consequences by a proposed plan modification.

The Court of Appeals emphasized that the urban renewal process resembles a traditional contractual arrangement,[39] binding both parties for the life of the plan.[40] Pub-

---

**35.** Section 711 is not the only "protective" provision in the Act. Thus, section 706(d) requires private redevelopers who lease or buy land from the RLA to comply with the project area redevelopment plan. The same provision also grants to the RLA the power to require other conditions in any leases so as to assure compliance with the plan as well as the authority to require that any covenants shall "run with the land." Under section 710, potential purchasers are required to insert provisions in their articles of incorporation or charter preventing any officer from modifying the project area plan without approval pursuant to section 711, and every lease or contract with the RLA must contain similar terms. And section 718 provides that, unless Congress enacts new legislation, the government itself is bound by the modification provisions of section 711.

**36.** Viewed in that light, the distinction RLA has recently sought to draw between *direct* and *indirect* effects loses much of its persuasiveness. The real distinction is one between substantial and insubstantial effects, for only that distinction implements the purposes of the redevelopment scheme.

**37.** Additionally, during that year alone, the District received over $5 million in taxes from private developers in Southwest, compared to less than $600,000 in 1953 before redevelop-

ment was started. 1973 Annual Report of the Redevelopment Land Agency.

**38.** One-third of the parcels in Area C, including Parcel 76, are owned by the RLA or the federal or District governments. Under the construction contended for by defendants, the government is free to make whatever changes it wishes with regard to that entire vast area, securing only its own consent. Such a construction of section 711 would render its protective purposes largely meaningless.

**39.** The restrictions in the plan have also been regarded as covenants running with the land. See section 706 of the Act; the Opinion of this Court in the 1968 litigation involving L'Enfant Plaza and the RLA; and 92 Cong.Rec. 9653.

**40.** The terms of the consent provision of section 711 were incorporated both in the urban renewal plan and in some or all of the sale and lease contracts between RLA and plaintiffs or their predecessors. Under ordinary contract principles, contractual language (which in this instance is identical with the statutory language) is to be construed in accordance with the intent of the parties at the time the contract was made. See, e. g., *North American Graphite Corp. v. Allen*, 87 U.S.App.D.C. 154, 184 F.2d 387 (1950).

lic policy can hardly be said to favor a sequence of events whereby the government makes a quasi-contractual promise of plan stability in order to attract private investment so as to help clear a blighted area, then to renege when the job has been done and it is too late for the investors to withdraw.[41] The government received what it bargained for—the revitalization of a section of the city that was a slum. Plaintiffs are entitled to receive what they bargained for—a stable, reliable plan that may not be modified to their substantial detriment without their consent.

## VI

Defendants assert that such a construction of the statute would be impractical,[42] and would encourage abuse by owners and lessees because it would, in effect, give them the power of veto over all proposed modifications. That argument takes too pessimistic a view of the situation.

In the first place, not every landowner in the redevelopment area will have the right to refuse consent. The vast majority will not, for consents will have to be sought only from those who are substantially and adversely affected by a proposed plan modification. Moreover, a number of urban renewal plans from other jurisdictions contain consent provisions which apparently operate in a manner similar to section 711 as the Court construes it without producing disastrous results. Finally, and perhaps most significantly, the public is not without recourse in the event an individual or corporation which is substantially affected arbitrarily refuses to cooperate with respect to an obviously vital project (such as Metro-

rail). Congress clearly has the power to amend the statute so as to eliminate any landowner's right to refuse to consent to proposed modifications,[43] and it probably also has the authority to enact legislation which would authorize the Mayor and City Council to override refusals to consent. Landowners acquired their properties subject to this inchoate congressional power, and they could not be heard to complain if, in the event of real abuse, remedial legislation were enacted. However, absent such legislation, their compact with the government must be honored.

For these reasons, the Court is unpersuaded by defendants' apprehension that an interpretation of the statute which permits indirectly affected landowners to object would be unmanageable.

Beyond that, many of the practical difficulties defendants foresee may be overcome by the adoption by the RLA of appropriate implementing regulations. See *Mills v. Board of Education of the District of Columbia*, 348 F.Supp. 866 (D.D.C.1972), where the District of Columbia government and its Board of Education were directed to develop procedures and programs necessary to implement the court's interpretation of the law.

 This Court has interpreted section 711 as affording to landowners who are substantially and adversely affected by a proposed plan modification an entitlement to consent or to refuse to consent to such modification. In implementation of the Court's decision, the Redevelopment Land Agency may adopt regulations [44] which will provide a method for determining whether

---

**41.** Defendants argue that investors are protected by procedural requirements, including the requirement of approval of plan changes by NCPC and the City Council. But the statute was intended to provide to the participants in urban renewal guarantees not dependent upon the good will of governmental bodies but to isolate them from the pressures of the political process.

**42.** *Wilderness Society v. Morton*, 156 U.S.App. D.C. 121, 479 F.2d 842, 855 (1973).

**43.** No one has been provided with any guarantee against subsequent congressional action. See the opinion of the Court of Appeals in this case prior to remand. *L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency, supra*, 184 U.S.App.D.C. at 34, 564 F.2d at 519.

**44.** Under D.C.Code § 5–703 (Supp. V 1978), the RLA is empowered to "adopt, prescribe, amend, repeal and enforce bylaws, rules, and regulations for the exercise of its powers under sections 5–701 to 5–719."

an existing owner or lessee may be substantially and adversely affected by a proposed plan modification.[45] The substantive standards to be applied by RLA in this regard must be consistent with the Court's decision, particularly Parts VII and VIII *infra*, and the analysis followed by the RLA until 1967.[46] It is only if, after its analysis in accordance with its regulations, the RLA determines that a landowner or lessee may be substantially and adversely affected by a modification to the area plan that it will have to. seek his written consent before forwarding the modification to the City Council for its approval. Any party seeking to overturn a decision of the agency in accordance with such regulations would, of course, bear a heavy burden.

It is the Court's conclusion that the early administrative interpretation of the statute, equitable estoppel principles, and public policy require an interpretation of the law which affords to those substantially and adversely affected by a proposed plan modification the right to consent or to refuse to consent, irrespective of whether the effect is direct or indirect.

## VII

The Court next turns to consider which plaintiffs, if any, are substantially and adversely affected by the proposed modifica-

tions and therefore entitled to object to the specific plan changes involved here.

A. Modification 23 would permit the addition of fifty rooms to the Channel Inn located on Sites D–1 and D–2 and would allow an increase of the building height limitation to allow that motel to build to a uniform three stories. Plaintiff L'Enfant Plaza claims that its hotel operations will be adversely affected by this addition, but it is clear that the adverse economic effects which L'Enfant Plaza hotel may experience are insufficient to warrant requiring its consent to the modification.

First, the two hotels do not appeal to the same clientele in any meaningful way. The L'Enfant Plaza hotel, which is part of the Loew's hotel · chain, contains 372 rooms, a ballroom with a maximum capacity of 850 persons, and twelve other function rooms with capacities ranging from 70 to 400 persons. It advertises in the national media and presents itself as a luxury, prestige hotel, and it attracts both a high-prestige clientele and blocs of patrons in connection with group and convention sales. By contrast, Channel Inn, a family-run business, contains 100 rooms, a restaurant, and three meeting rooms ranging in capacity from approximately 75 persons downward. The motel business of the Channel Inn is focused principally on individual rather than on group sales. Further, the motel custom-

---

**45.** *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council*, 435 U.S. 519, 546–48, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), is not inconsistent with this procedure. In that case, the Supreme Court held that courts may not impose procedural requirements beyond those specified in the Administrative Procedure Act. See *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973); *Culpepper League for Environmental Protection v. NRC*, 187 U.S.App.D.C. 422, 574 F.2d 633 (1978); Rodgers, W., *A Hard Look at Vermont Yankee: Environmental Law Under Close Scrutiny*, 67 Geo.L.J. 699, 704 (1979); Stewart, R., *Vermont Yankee and the Evolution of Administrative Procedure*, 91 Harv.L.Rev. 1805 (1978). Here, plaintiffs have not requested the imposition of additional procedural requirements, but the Court is filling a void left by a statutory provision which necessitates procedures to give it meaning and content. Additionally, section 703 provides ex-

plicit authority for the issuance of regulations. See note 44, *supra*.

**46.** Specifically, RLA would be justified in its regulations to provide that consideration shall be given to the aggregate of factors such as the economic effect of implementing a proposed plan modification; the impact on existing traffic and parking patterns and the number of automobiles in the area; the aesthetic or environmental impact on nearby properties, including the impact of any proposed increase in height on surrounding structures or other interference with scenic views; an increase in the density of development which may result from the implementation of a proposed plan modification on existing light and air access and pattern for nearby properties; and the impact on the ingress and egress for nearby properties. As indicated elsewhere herein, such impacts would have to be substantial to be given controlling weight.

ers are in general cost-conscious and often limited by per diem rates.[47]

Second, the addition to the Channel Inn would add a miniscule percentage to the total number of hotel rooms in the Washington area.[48] Even where the two establishments appeal to the same clientele, the Channel Inn does not compete with L'Enfant Plaza Hotel to any greater degree than do other hotels in the Washington area. Thus, the proposed Channel Inn expansion would not affect L'Enfant Plaza more adversely than a like expansion of any other hotel in the Greater Washington area. The Court concludes that L'Enfant Plaza is neither directly nor indirectly affected within the meaning of section 711 with respect to Modification 23 and is therefore not entitled to object to its approval.[49]

B. The remaining plaintiffs in this litigation are the Hoeber and Harbour Square owners of private Homes and the Reporters Building, owners of an office complex. These plaintiffs claim that the defendants' failure to secure the written consents of purchasers and lessees who may be indirectly affected by Modification 23 diminishes the integrity of the urban renewal plan and thereby reduces the property value of their land.[50]

This injury to the plaintiffs is too tenuous and speculative to require that their consents be obtained for implementation of the modification. If a landowner or lessee had the right to object merely because of his intangible interest in the integrity of the plan, every landowner and lessee in the renewal area would effectively have a complete veto over any and all plan modifications. This is not what was contemplated in the statute; it would also render operation of the urban renewal plan totally impractical and unmanageable. The Court holds that plaintiffs Harbour Square, Hoeber, and the Reporters Building are not affected by Modification 23 within the meaning of section 711, and that defendants are not required to obtain their consents before implementing that modification.

## VIII

Modification 22 would change the use of Parcel 76 from church or parochial school use to use for up to 200 apartments for low or moderate income families.[51] Modification 22 would also allow an increase in the maximum height of the proposed structures from 60 feet to 90 feet.

A. The plaintiffs who are most directly affected by this change are the Hoeber plaintiffs—49 homeowners of individual townhouses in a development known as Town Square. The Town Square development, located across Seventh Street from Parcel 76, was built by the Bresler & Reiner Company during 1966–68, and homes in the complex were being sold until 1971.[52] The Hoeber plaintiffs were bound by the terms of the Area C plan which is referred to in their deeds, and they have objected to Modification 22 ever since its introduction by NCPC.

The Court concludes that the Hoeber plaintiffs would be substantially and ad-

---

47. On weekends, the rates charged by the two establishments are more comparable, but the other operative factors referred to herein outweigh that one consideration.

48. It is estimated that the 50-room addition to the Channel Inn would constitute an increase of between $2/10$ths or $3/10$ths of one per cent.

49. L'Enfant Plaza has not opposed the development of a 500-room Holiday Inn within three blocks of L'Enfant Plaza in Southwest Washington.

50. Harbour Square also claims that the proposed plan modification would aggravate the parking problem on the Southwest area waterfront. That single tangible effect of the modi-

cation is not sufficiently substantial to confer upon these plaintiffs the right to object.

51. The proposed modification would additionally permit a day care facility and housing for the elderly. Government witnesses estimated that between 205 and 320 children would also be living in the low and moderate income housing project.

52. The developer sold the properties to plaintiffs at market price without any governmental subsidy or financial guarantee such as those provided by the Federal Housing Administration or the Veterans Administration.

versely affected by an implementation of Modification 22, and that under the statute they have a right to object to the proposed modification.

First, the proposed change from church use to residential use will result in an increase in population density.[53] This increase in population density may be expected to cause an accompanying increase in pedestrian and vehicular traffic. That traffic is likely to have a special impact on the Town Square development which is located between Parcel 76 and the single shopping mall and the single chain supermarket in the Southwest area. Further, the modification would permit 400 off-street parking spaces which would increase the traffic on Seventh Street in front of plaintiffs' homes and on the side streets through Town Square which lead to the shopping mall.

Second, Modification 22 is likely significantly to affect the property values of the plaintiffs' homes. It has been estimated that under the proposed modification the value of Parcel 76 for tax assessment purposes could be written down to as little as 80 cents per square foot. By contrast, the latest tax assessment value of the townhouse lots across Seventh Street was more than $23 per square foot. Even if the reduction in values should not turn out to be as significant as these figures would indicate, clearly a substantial decrease in the townhouse property values may be expected if the modification is implemented.

Third, the proposed use of Parcel 76 may be detrimental to plaintiffs environmentally and aesthetically since it is likely to obstruct the homeowners' view and block their sunlight exposure.[54] While the final plans for the proposed buildings on that parcel have not yet been approved, and while this factor does not apply to all of the Hoeber plaintiffs, it is appropriately taken into account in conjunction with the other factors referred to above [55] in determining that the Hoeber plaintiffs have a right to object.[56]

B. As concerns the Harbour Square and Reporters Building plaintiffs, their interest in Parcel 76 is no greater than that which they have in Parcels D–1 and D–2, and their consents therefore need not be obtained prior to any implementation of a plan modification which operates directly upon Parcel 76.

C. The issue is closer with respect to plaintiff L'Enfant Plaza, for the range of its interests may be said to lie somewhere between those of the Hoeber plaintiffs, which have a right to object, and those of the other plaintiffs which do not. L'Enfant Plaza has a more tangible concern about Parcel 76 than is expressed merely by the concept of the "integrity of the plan;" yet it is not as intimately affected by physical changes on that Parcel as are the Hoeber plaintiffs. After weighing the various factors with considerable care, the Court has concluded that plaintiff L'Enfant Plaza is not affected in a way that is so substantial and so adverse that its consent is required.

---

53. The modification would add 125–200 units of housing with a unit density of 40 to 65 units per acre. A church would have few, if any, residents. A parochial school would likewise have no full-time residents, although it would attract students, largely during the daylight hours.

54. Defendants argue and they have demonstrated that, depending upon the configuration of the buildings on Parcel 76, this is not necessarily so. However, the proposed plan change would allow for construction which will have such an effect.

55. It is not necessary to decide the extent to which this factor, standing alone, would provide a basis for an objection. A slight impairment of the view undoubtedly would not; the erection of a towering building across from small homes might be sufficient by itself.

56. The Hoeber plaintiffs also contend that an increase in population density will exacerbate trespassing and vandalism problems which they are presently experiencing. The Court rejects this argument because the causal connection between an increase in population and an increase in such crimes is too tenuous and speculative to entitle the plaintiffs to object to a proposed modification on that basis. The Court likewise rejects on public policy grounds the arguments made by some of the plaintiffs (but not by L'Enfant Plaza or the Hoeber plaintiffs) that because of their income levels the tenants who would occupy the proposed housing project might be undesirable.

What ultimately defeats L'Enfant Plaza's claim in that regard are the geographic facts. L'Enfant Plaza is separated from Parcel 76 by a wide freeway; the Parcel 76 area is located at a significantly lower elevation than the L'Enfant Plaza complex; and the road network connection between the L'Enfant Plaza area, on the one hand, and the waterfront area, on the other, consists of relatively narrow, tenuous roadways. These geographic facts have as their consequence that, as a realistic matter, noise, sunshine, and other environmental factors arising on Parcel 76 would affect L'Enfant Plaza only to an insubstantial degree;[57] the economic value of L'Enfant Plaza is unlikely to suffer as a result of the proposed plan modification respecting the Parcel 76 area; and an increase in population and automobile density on Parcel 76 would not be likely substantially to spill over across the freeway through the narrow roads to the much more elevated L'Enfant Plaza complex. In short, while L'Enfant Plaza may be said to be affected by the proposed plan change, it is not so substantially and adversely affected that under the statute it has a right to object.

### IX

For the reasons stated, the Court this date issues an injunction permanently restraining defendants from implementing Plan Modification 22 without the prior written consent of the plaintiffs who are owners of property in the development in Southwest Washington known as Town Square. The complaints of the remaining plaintiffs will be dismissed both with respect to Modification 22 and Modification 23, as will be the complaint of the Hoeber plaintiffs with respect to Modification 23.

The Court is also issuing a declaratory judgment that the District of Columbia Redevelopment Act of 1945 requires that, before implementing any modification of the Area C Urban Renewal Plan, the RLA is required to undertake an analysis to determine whether an existing owner or lessee may be substantially and adversely affected by such modification and if, upon such analysis, it determines that any such owner or lessee would be so affected, the modification shall not become effective unless and until the written consent of such owner or lessee shall have been secured.

---

**57.** Unless an establishment such as a factory were to be constructed on Parcel 76.