**PERPETUAL BUILDING LIMITED PARTNERSHIP, Plaintiff,**

and

**Mutual Benefit Life Insurance Company, Intervenor-Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. No. 85–1618.**

United States District Court,
District of Columbia.

June 26, 1985.

Michael A. Schlanger, Piper & Marbury, Washington, D.C., for plaintiff.

David R. Kuney and Paul A. Kaplan, David, Hagner & Harvey, Washington, D.C., for intervenor-plaintiff.

Robert Harlan and James Randall, Asst. Corp. Counsel, D.C., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on the motions of plaintiff Perpetual Building Limited Partnership ("Perpetual") and plaintiff-intervenor Mutual Benefit Life Insurance Company ("Mutual Benefit") for preliminary injunction against the defendants enjoining them from further acts characterized as unlawful, i.e., breach of contract, debarment, or suspension of Perpetual as a government contractor, from terminating nine commercial leases for office space in the Perpetual Building located at 1111 E Street, N.W., Washington, D.C., or from further withholding of rent due under the leases, and to compel payments due under the leases in the interim. On May 21, 1985, Judge Pratt of this Court entered a temporary restraining order. Upon consideration of the aforesaid motions, the memoranda in support thereof and in opposition thereto, the entire record herein, including affidavits and deposition testimony, and counsel having been heard in open court, the Court denies plaintiff's motion for preliminary injunction. Following are the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

1. D.C.Code § 1–105.

## FINDINGS OF FACT

Plaintiff Perpetual is a District of Columbia limited partnership with a principal place of business at 8550 Lee Highway, Suite 700, Fairfax, Virginia 22031. Its general partner is Angel S. Roubin, and its sole asset is the Perpetual Building, a commercial office building located at 1111 E Street, N.W., Washington, D.C. (Perpetual's Complaint). Intervenor-plaintiff Mutual Benefit is a New Jersey corporation with its principal place of business located at 520 Broad Street, Newark, New Jersey. Its business activities include the investment of capital in real estate projects throughout the United States, including permanent real estate mortgages on income-producing properties, such as commercial office buildings. ("Mutual Benefit's Complaint").

The defendant District of Columbia is a municipal corporation created by Act of Congress.[1] It is the contracting party and lessee under nine leases in question with Perpetual, the lessor. Seven of the leases were executed on November 16, 1984 and the remaining two leases were executed on January 7, 1985 by the District's then Director of Administrative Services, Jose Gutierrez.

Defendant William Johnson is the Acting Director of the Department of Administrative Services of the District of Columbia Government ("DAS"). As Acting Director, he has general responsibility for the contracting function of the District and for the District's performance under the leases in question. Mr. Johnson has been sued individually and in his official capacity. (Perpetual's Complaint, ¶ 6; City's Answer, ¶ 6).

Defendant Thomas Downs is the City Administrator and Deputy Mayor for Operations of the District of Columbia. Mr. Downs has been sued individually and in his official capacity. (Perpetual's Complaint, ¶ 7; City's Answer, ¶ 7).

The Department of Administrative Services was officially created on March 2,

1984 by Mayor's Order 84–52. The mission of the Department is "to issue regulations for the procurement, management and disposal of D.C. Government property ... the procurement of contract services ... [and] to provide a means for the Mayor to administer certain contracting authority vested in him by law." Legal Counsel's First Report on Government Contracting dated May 13, 1985, Exhibit 5, District of Columbia's Memorandum of Points and Authorities in Opposition to Motion for Preliminary Injunction (hereinafter the "Reid Report").

In March 1984, Mr. Jose Gutierrez became the first Director of DAS, a cabinet-level position. As DAS Director, Mr. Gutierrez was the City's "principal contracting officer." (Reid Report, p. 1). Soon after he took office, Mr. Gutierrez and the DAS were involved in plans to relocate various City agencies as a result of the expected completion of the new Municipal Office Building at 14th and U Streets, N.W. in April 1985. (Reid Report, p. 24). One of the properties in which the City was interested in acquiring space was the Perpetual Building located at 1111 E Street, N.W. At that time the building was owned by the Perpetual Building Limited Partnership, whose general partners were Allan E. Rozansky and Alan Kay.

In March 1984, the Department of Public Works ("DPW") moved into the third and fourth floors of the Perpetual Building pursuant to a letter of intent while a formal lease was being drawn. In October 1984, a five year lease was executed for $18.25 per square foot. (Reid Report, p. 25).

In the spring and early summer of 1984, the District had discussions with Mr. Rozansky and Mr. Kay regarding leasing of the entire Perpetual Building. The parties discussed both a straight lease and a lease with an option to purchase. Rozansky and Kay offered to lease several floors of the building at varying rates ranging from $17.50 per square foot for the second floor to $20.00 per square foot for the first floor.

(June 4, 1984 letter from Rozansky and Kay to Elbert Ransom, attached to Thomas Downs' answers to interrogatories). Mr. Gutierrez rejected the offer and instead proposed a five year lease of the entire building for $17.50 per square foot. Rozansky and Kay rejected the counteroffer and negotiations broke off.

On August 23, 1984, Mr. Gutierrez and Elbert Ransom, Jr. (Administrator for the Real Property Administration, DAS) met with Angel Roubin and his associate, Robert Moore (Vice President in Charge of Finance for Roubin and Janeiro), at the invitation of Mr. Gutierrez, to discuss the possibility of Mr. Roubin purchasing one of several properties the District was interested in leasing. Mr. Roubin was given a list of properties. Mr. Roubin agreed to consider the Perpetual Building, which was the only property listed then available for purchase. (Ransom Dep. pp. 57–59; Roubin Dep. pp. 8, 13–14). After obtaining information from Mr. Ransom on lease terms, including price, Mr. Roubin submitted an offer to purchase the partnership shares in the Perpetual Building Limited Partnership in late summer or early fall of 1984 (Roubin Dep. pp. 21–23).

Mr. Gutierrez and Mr. Roubin were no strangers. Mr. Roubin met Mr. Gutierrez sometime between 1979 and 1983. They developed a friendship and had business and social contacts with one another. Mr. Roubin attended social functions at Mr. Gutierrez' home. (Roubin Dep. pp. 16–18).

On October 2, 1984, Mr. Roubin submitted an offer to lease the entire Perpetual Building to the City at the rate of $26.12 per square foot for ten years for a total price of $22.9 million.[2] (Reid Report, p. 27). After Mr. Ransom's office prepared the master lease and Mr. Gutierrez signed it, it was forwarded to Mr. Roubin, who signed and returned it to Mr. Gutierrez by letter dated October 31, 1984. (Ransom Dep. p. 129; Roubin Dep. p. 139). The lease was not dated and was not signed by

---

**2.** There is some dispute as to the rental costs of the Roubin lease proposal compared to the Rozansky and Kay offer. Perpetual contends that

Mr. Roubin's offer was more favorable to the District, a claim the District strongly contests.

a DAS attorney as required by the lease. (Ransom Dep. p. 139).

The lease for the entire Perpetual Building was then forwarded to the DAS Office of Policy and Management for a determination of legal sufficiency. Both John Stone III, Chief of that office, and Christopher G. Lipscombe, a staff attorney in the office, advised Mr. Gutierrez that he could not execute the $22.9 million lease because it exceeded his leasing authority under Organization Order No. 9, which required contracts for more than $5 million to be approved by the Mayor or his designee, the City Administrator. (*See infra*). (Stone Dep., pp. 46–48; Lipscombe Dep., pp. 55–59).

Mr. Gutierrez then proposed to divide the single lease into separate leases for each agency which would occupy the Perpetual Building. (Stone Dep. p. 47; Lipscombe Dep. p. 58). Mr. Gutierrez stated that this made more sense anyway because agency-specific leases would make it easier for DAS to recoup rental funds from the individual operating units. (Stone Dep. pp. 47–48, 52–54). John Stone advised Mr. Gutierrez that division of the master lease for the Perpetual Building into separate leases for each agency would not contravene Organization Order No. 9. (Stone Dep. pp. 52, 132; Ransom Dep. pp. 143–44). Christopher Lipscombe, the DAS staff attorney involved in the discussions, did not object to division of the leases. (Lipscombe Dep. pp. 57–59; Stone Dep. p. 132). Mr. Roubin did not participate in the decision to separate the leases. (Reid Dep. pp. 42–43, 102; Moore Aff. ¶ 4; Campbell Dep. p. 163; Ransom Dep. p. 142).

At Mr. Gutierrez' instruction, Mr. Ransom's office prepared seven separate leases for the Perpetual Building. Mrs. Marianne Niles, a DAS staff attorney, signed the individual leases as meeting the requirements of legal sufficiency. (Ransom Dep. pp. 143–45). On November 14, 1984, Mr. Gutierrez sent the leases to Mr. Roubin, who had been advised that the District required a separate lease for each agency which would occupy the Perpetual Building.[3] (App. 18 to Perpetual's Proposed Findings of Fact and Conclusions of Law (hereinafter "App."); Roubin Dep. pp. 41–43). Mr. Roubin executed the leases and returned them to Mr. Ransom on November 16, 1984. Mr. Roubin had a courier wait until the District executed the leases because they had to be delivered to the Union Trust Company of Maryland ("Union Trust") in Baltimore that day. (App. 19). Mr. Roubin was attempting to arrange financing for the potential purchase of the Perpetual Building. When the District was about to execute the leases, Mr. Ransom became aware that Perpetual would be seeking financing for its purchase of the Perpetual Building and that the lender's decision would be based in part on its review of the leases. (Ransom Dep., pp. 205–07).[4]

The seven leases are identified as follows:

1. DCFL 84–18: Board of Election and Ethics, 16,154 sq. ft. on the 1st and 5th floors;

2. DCFL 84–19: Office of the Corporation Counsel, 5,500 sq. ft. on the 6th floor;

3. DCFL 84–20: D.C. Energy Office, 19,102 sq. ft. on the 3d, 7th and 8th floors;

4. DCFL 84–21: General Accounting Office, D.C., 2,000 sq. ft. on the 6th floor;

5. DCFL 84–22: Department of Public Works (Bureau of Traffic Adjudication), 13,088 sq. ft. on the 4th floor;

6. DCFL 84–23: Department of Public Works (Facility Operations and Maintenance Administration), 13,050 sq. ft. on the 4th floor; and

---

**3.** It is noted that there were two separate leases for the Department of Public Works. Had there been only one lease for this department, the rent payment would have been in excess of $5 million.

**4.** Mr. Ransom's knowledge of Perpetual's intention to seek financing apparently refers to Perpetual's dealings with the Union Trust Company, not Mutual Benefit.

7. DCFL 84–24: Department of Administrative Services, 11,476 sq. ft. in the basement.

The rent was $26.12 per sq. ft. (Exh. Al–7 to Plaintiff's Memorandum of Points and Authorities in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction.) The two leases at $26.12 per square foot for the Department of Public Works for the 3rd and 4th floors (DCFL 84–22 and 84–23) were intended to replace the Rozansky and Kay lease for that same space signed October 11, 1984 (DCFL 84–1), which was for $18.25 per square foot.[5]

On November 19, 1984, Angel Roubin and his sons Richard and Jose purchased 100 percent of the partnership interests of Perpetual Building Limited Partnership from its former owners (Roubin Aff. ¶ 3, App. 1; Roubin Dep. p. 44). Union Trust provided Mr. Roubin with short-term acquisition financing by permitting him to assume the existing mortgage on the Perpetual Building. Union Trust also issued a construction loan relating to the Perpetual Building. The closing of the loans took place the following day, as a result of which Perpetual's total obligation to Union Trust was $12,600,000. (Oliver Aff. ¶¶ 2, 5, App. 2). Prior to the closing, a Vice President of Union Trust telephoned Ms. Pamela Hatcher, a special assistant to Mr. Ransom, who advised the bank official that the District had approved and executed the leases and that it intended to occupy the remaining space in the Perpetual Building (Oliver Aff. ¶ 4, App. 2).

During the first week of December 1984, the Mayor and Mr. Downs, the City Administrator, learned about the Perpetual leases from various agency heads who complained about their scheduled move and the building's rent. (Downs Dep. pp. 86–87, 114). Mr. Downs requested from Mr. Gutierrez a list of the agencies covered by the Perpetual leases, the amount of space leased, and the rental cost. (Downs Dep. pp. 112, 185). Mr. Downs also instructed Mr. Gutierrez to submit the Perpetual leases to the Corporation Counsel for a review for legal sufficiency. (Downs Dep. p. 71).

On December 24, 1984, Mr. Downs received the information he requested from Mr. Gutierrez, after which he told Mr. Gutierrez that the leases were unacceptable. (Downs Dep. p. 59). Mr. Downs concluded that Mr. Gutierrez had "exceeded his authority and he was grossly insubordinate in doing it." (*Id.*). "However [Gutierrez] got into them, he could get out of them." (*Id.*).[6]

The same day, December 24th, Elbert Ransom drafted a memorandum to the Corporation Counsel stating that "[t]he City Administrator is currently reviewing ways to legally cancel the leases the City has [at 1111 E Street, N.W.]." (App. 24).

Around the first week of January 1985, Mr. Downs told Mr. Gutierrez either to get out of the Perpetual leases, or at least reduce the space under the lease and the rent per square foot, or else Mr. Downs would strip him of his authority and remove him from DAS and break any commitments Mr. Gutierrez made that exceeded Mr. Gutierrez' authority. (Downs Dep. pp. 66–69, 186). At a meeting on January 7, 1985, Mr. Downs gave Mr. Gutierrez a memorandum, with the Mayor's approval, which stated that, "[p]ursuant to our previous conversations, until further notice, no negotiations should take place over space leasing without my written approval. Further, no leases may be executed without the Mayor's or my approval." (App. 25; Downs Dep., pp. 62–63). Mr. Downs agreed to keep the revocation of Mr. Gutierrez' authority secret after Mr. Gutierrez pleaded with Mr. Downs not to publicize the purported revocation of authority and promised not to sign any more leases without Mr. Downs' prior written approval. (Downs Dep. pp. 56–57). By the next day, Mr. Downs had informed the Mayor of Mr.

---

5. Normally when a building is sold it is subject to existing leases.

6. It is unclear from Thomas Downs' testimony whether he first told Mr. Gutierrez that the leases were unacceptable on December 24, 1984, or on January 2, 1985.

Downs' decision not to publicize the revocation of Mr. Gutierrez' authority. (Downs Dep., p. 64). Mr. Downs understood that by not publicly announcing the removal of Mr. Gutierrez' contracting authority, the public would continue to believe that Mr. Gutierrez had such authority. (Downs Dep. p. 58).

Sometime this same day, January 7, 1985, Mr. Gutierrez executed two additional leases for the Perpetual Building at $26.12 per square foot. (Downs Dep. p. 187). Mr. Downs learned of these additional leases a week later. (Downs Dep. p. 186).

Also on January 7th, Mr. Downs sent a handwritten memo to Inez Smith Reid, the Corporation Counsel, asking her, "Do we have any legal options to exercise in getting out of these leases?" (Downs' Answer to Interrogatory 11; App. 26).

On January 28, 1985, Perpetual submitted an application to Mutual Benefit for a $15 million loan and included a check for $150,000. Mutual Benefit received the Perpetual leases around this period of time and on February 4, 1985, Mutual Benefit issued its loan commitment for a $15 million loan to Perpetual. (Anderson Aff. ¶ 3).

In late January, Mr. Gutierrez told Mr. Downs that he would not renegotiate or break the Perpetual leases. On January 30, 1985, Mr. Downs instructed Anthony Calhoun, the City Controller, not to make any rent payments on the Perpetual Building. (Downs' Interrogatory Answer 11; Downs Dep. pp. 70–71). The first rental payment for the initial seven leases was due January 31, 1985. On February 20, 1985, Robert Moore sent a letter notifying the District that its payment was late and that it had been assessed late fees plus interest. (App. 33).

On February 5, 1985, after Mutual Benefit issued its $15 million loan commitment, the Corporation Counsel sent a memorandum to Mr. Downs in response to his request for an opinion as to the validity of the Perpetual leases [7] (Downs Dep. pp. 78–

79). Mr. Downs informed the Mayor of the contents of the opinion "upon receipt." (Downs Dep. pp. 79, 84–85). Ms. Reid told Dr. Reid that she had not rendered any opinion as to the validity of the leases. (Reid Dep. p. 64).

At a meeting on February 13, 1985 between the Mayor, Mr. Downs and Mr. Gutierrez, Mr. Downs recommended to the Mayor that Mr. Gutierrez be fired for gross insubordination and incompetence. (Downs dep. pp. 61, 82–83). The other option discussed was transferring Mr. Gutierrez to another position in the D.C. Government. (Downs dep. p. 62). Three weeks later on March 7, 1985, the Mayor announced that Mr. Gutierrez had been removed as DAS Director and reassigned to another post within the District government.

Several significant events occurred in March 1985. On March 1, 1985, Mr. Gutierrez sent a letter to Robert Moore of Roubin Associates in response to Mr. Moore's February 20th demand for rent. The letter states that "the D.C. Controller has been instructed by Mr. Thomas M. Downs, City Administrator/Deputy Mayor for Operations, to hold the payment of rents for this property, pending resolution of some questions that Mr. Downs has about the leases." Mr. Gutierrez also advised Mr. Moore that he would continue to prepare and submit vouchers for rent due and payable. (App. 35).

On the very same day, Mr. Gutierrez, although his authority to act for the District had been revoked, executed two tenant estoppel certificates for the Perpetual Building leases, one for the 3rd and 4th floors and one for floors 2, 5, 6, 7, and the basement. (App. 34). The certificates state that:

The Lease is in full force and effect. The undersigned has accepted the Leased Premises without exception and all requirements for the commencement and validity of the Lease ... have been satisfied. The undersigned is presently in possession of the Leased Premises and is

---

**7.** The District has not provided this memorandum to plaintiffs, asserting attorney-client privi-

lege and apparently relying on this Court's order regarding discoverable material.

paying the rentals due under the Lease. The Lease has not been modified, supplemented or amended in any way except as may be indicated in the caption above. The Lessor is not in default under the Lease. The undersigned has no present defenses, claims or set-offs under the Lease against rents or charges due or to become due thereunder.

(App. 34). When the estoppel certificates were signed, both Mr. Gutierrez and Mr. Roubin knew that the District Government had not paid any rent under the Perpetual leases and the reason therefor.

The tenant estoppel certificates were signed pursuant to paragraph 26 of the D.C. leases that were used for the Perpetual Building, which states that the District agrees to execute a written acknowledgement that the "Lease is unmodified and in full force and effect" and that the District "has no charge, lien or claim of set-off under this Lease, or otherwise, against rents or other charges due or to become due ...." The same paragraph further states that "[A]ny such statement delivered pursuant hereto may be relied upon by any owner of the Building, any prospective purchaser of the Building, any mortgagee or prospective mortgagee of the Building or of Lessor's interest, or any prospective assignee of any such mortgagee." (Exh. B to Perpetual's Application for Temporary Restraining Order).

On March 20, 1985, the District, through Mr. Melvin Carter, instructed Mr. Moore of Roubin Associates to suspend all "plans and work until further notice" regarding interior design plans for the Perpetual Building. (App. 37; Ransom Dep. p. 214). Construction on the interior of the Perpetual Building had not yet taken place. (Carter Dep. p. 45).

That same month, sometime before March 28th, Angel Roubin had lunch with Mr. Gutierrez, at which Mr. Gutierrez advised Mr. Roubin that the District wanted "a lot of money" cut off the Perpetual leases. Mr. Roubin refused. (Roubin Dep. pp. 49–53).

On March 23, 1985, *The Washington Post* published an article regarding the contracting process at DAS. The article referred to the Perpetual leases, stating:

Some officials questioned his decision, for example, to enter a 10-year, $22.4 million lease agreement for a building at 1111 E Street, NW that is owned by a partnership controlled by Angel S. Roubin, a Hispanic businessman. Gutierrez denies that he approved the contract as a favor to a Hispanic, and he adds that Downs vetoed his effort to negotiate a deal in which the District would end up with half-ownership of the building at the end of the term of the lease.

Another article mentioning the Perpetual Building appeared in *The Washington Post* on March 26, 1985. The article reported the demotion of Mr. Gutierrez and the District's investigation of Mr. Gutierrez. It stated:

Barry also announced that his legal counsel, Herbert O. Reid, had launched an investigation into possible conflicts of interests that Gutierrez might have had in advocating that the city government lease a building at 1111 E Street, NW from a partnership headed by a prominent Hispanic businessman, Angel Roubin.

The Reid Report was charged with investigating whether Mr. Gutierrez engaged in any impropriety or illegal conduct while he was DAS Director and whether there had been improper political influence on the District's contracting process. (Reid Report, pp. 1–2).

As of March 28, 1985, the only rent Perpetual received from the District for the Perpetual Building was for two floors which the Department of Public Works was occupying. The payment was at the $18.25 rate established by the five year October lease with Rozansky and Kay, not at the $26.12 per square foot rate set by the November 1984 and January 1985 leases between the District and Mr. Roubin. At no time had the District made any rental payments to Perpetual at the $26.12 rate. (Roubin Dep. pp. 53–54).

On March 28, 1985, however, Mr. Roubin, as general partner of Perpetual, closed on the $15 million loan from Mutual for the financing of the Perpetual Building. Mr. Roubin signed a promissory note in the principal amount of $22 million, which was secured by a deed of trust. On the same day, Mutual disbursed to Perpetual the $15 million. (Anderson Aff.).

Under the terms of the promissory note and the deed of trust, Perpetual was obligated to commence loan payments on May 1, 1985 in the amount of $162,192.43. The deed of trust also provides that in the event of default, Mutual Benefit may act as owner of the Perpetual Building and collect and receive all of the economic benefits and rights under the Perpetual leases. (Mutual Complaint, ¶¶ 5, 11).

On April 11 or 12, 1985, the new Director of DAS, defendant William Johnson, met with Angel Roubin regarding Mr. Roubin's demands for rental payments under the Perpetual leases. Mr. Johnson advised Mr. Roubin that it was the District's position that the only Perpetual lease that existed was the old lease for the third and fourth floors of the Perpetual Building entered into with the previous Perpetual owners. Dr. Reid advised Mr. Johnson of the District's position. (Johnson Dep., pp. 65–67). Several days later, on April 19th, Dr. Reid met with Angel Roubin in connection with his investigation and advised Mr. Roubin that the District Government was in the process of deciding whether to repudiate the leases. It was Dr. Reid's understanding that the District was waiting for his report. (Reid Dep., p. 76).

The Reid report focused on contracts entered into by Mr. Gutierrez and Roubin-owned business entities; three of the four contracts examined by the report involved businesses owned by Angel Roubin. The Reid report, issued on May 13, 1985, concluded that the Perpetual leases were of "questionable legal validity." (Reid Report, p. 49). Dr. Reid, at page 137 of his deposition, testified that he did not think Mr. Roubin was telling the truth about his

understanding of the reason for separate leases.

On or about May 16, 1985, Mutual Benefit issued a demand letter to Perpetual advising it of its default under the terms of the deed of trust and stating that it intended to foreclose on the Perpetual Building. (Anderson Aff., ¶ 9). The next day, the City sent a letter to Perpetual informing it that the Perpetual leases had been terminated. On May 20, 1985, Perpetual and Mutual Benefit applied to this Court for temporary injunctive relief, and a temporary restraining order was granted. Oral argument on plaintiffs' motion for preliminary injunction was heard on June 10, 1985.

## CONCLUSIONS OF LAW

In determining whether to grant preliminary injunctive relief, the Court must consider four factors: (1) has petitioner established a likelihood of success on the merits? (2) has petitioner shown that absent the requested relief, it will suffer irreparable injury? (3) will the injunction substantially harm other parties to the litigation? and (4) where lies the public interest? *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir.1958). The degree of likelihood of success on the merits that the movant must show varies according to the court's assessment of the other three factors. If the other three factors strongly favor preliminary injunctive relief, the movant need only establish a "substantial case on the merits"; the Court need not find that ultimate success by the movant is a "mathematical probability." *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977).

### A. *Likelihood of Success on the Merits*

■ Plaintiffs raise essentially three arguments: that the District has *de facto* barred or suspended Perpetual by summarily canceling the nine Perpetual leases without providing due process of law, that the Perpetual leases are valid, and that in any event the defendants are estopped

from denying the validity of the leases. Each of these claims is discussed below.

### 1. *Due Process Claim*

Perpetual asserts that the District's termination of the Perpetual leases constitutes a *de facto* debarment or suspension of Perpetual from doing business with the District of Columbia Government in violation of its fifth amendment due process rights. Perpetual relies principally on *Art-Metal-U.S.A., Inc. v. Solomon*, 473 F.Supp. 1 (D.D.C.1978), which held that "due process of law requires that before a contractor may be blacklisted (whether by debarment or suspension) he must be afforded specific procedural safeguards, including, *inter alia*, a notice of the charges against it, an opportunity to rebut those charges, and, under most circumstances, a hearing." 473 F.Supp. at 4. In *Art-Metal*, the General Services Administration had abruptly cancelled a contract with Art-Metal, one of its suppliers of office furniture for over twenty years, after a series of newspaper articles concerning possible abuses in Art-Metal's contract dealings with GSA were published. The Court granted preliminary injunctive relief, finding that GSA's cancellation of one Art-Metal contract and suspension of four others was aimed at Art-Metal's overall status as a GSA contractor and was without any apparent justification.

*Art-Metal* is readily distinguishable from the instant case. The District's termination of the nine Perpetual leases, which essentially involve a single transaction, was based on the District's reasoned belief that the contracts are invalid. *See Community Economic Development v. United States*, 577 F.Supp. 425 (D.D.C.1983). Moreover, this transaction is the first and only transaction involving Perpetual and the District. Furthermore, unlike *Art-Metal*, the District has never indicated a refusal to transact business with Perpetual in the future. Indeed, the District has made rental payments to Perpetual under the terms of the old lease with Rozansky and Kay for space for the Department of Public Works in the Perpetual Building.

Perpetual's attempt to paint the District's actions as a conspiracy against Angel Roubin is unpersuasive. Perpetual contends that the District has declared void another contract with a Roubin-owned company and has directed a firm with which the District has a property management contract to stop contracting maintenance and repair work to a construction business of which Angel Roubin is president. Aside from failing to substantiate the latter claim, Perpetual mistakenly focuses on Angel Roubin, who is not a named party to this action, instead of Perpetual.

Perpetual's efforts to fit within the parameters of *Art-Metal* are unconvincing. To find otherwise would require a broadening of *Art-Metal* far beyond its intended scope. Accordingly, the Court finds that Perpetual has failed to show a likelihood of success on the merits on its due process claim. Perpetual's claim appears to amount to nothing more than the single termination of an invalid contract.

### 2. *Validity of the Perpetual Leases*

The question of the validity of the Perpetual leases focuses on Organization Order No. 9, as amended,[8] regarding the appointment and authority of contracting officers of the District of Columbia Government. That order provides in pertinent part:

A. The officials occupying each of the following positions are hereby appointed Contracting Officers for the District of Columbia, subject to all applicable laws, rules, regulations, policies, standards, systems and procedures, and such instructions as the Mayor or his designee may from time to time give:

(1) Director, Department of [Administrative Services]

Part I, A(1) (App. 16). As Director of DAS, Mr. Gutierrez was authorized to enter into and administer contracts on behalf of the

---

**8.** Organization Order No. 9, Mayor's Order 75–261 (1975), was amended by Mayor's Order 84–54 on March 2, 1984. The amendment changed the Director, Department of General Services, to Director, Department of Administrative Services.

**612**

District of Columbia with respect to "the acquisition by purchase of real property, demolition of improvements on real property, managing, inleasing, outleasing or disposing of real property...." Organization Order No. 9, Part II, A(1) (App. 16).

Organization Order No. 9 limits the contracting authority of the Director of DAS and all other contracting officers to contracts for $5 million or less. It provides:

B(1) All contracts and change order [sic] shall be subject to the following:

(c) In the case of each contract in excess of $5,000,000, approval of the executed formal contract by the Mayor or his designee.

Organization Order No. 9, Part II, B(1)(c).

Plaintiff has failed to show a likelihood of success on its claim that the nine Perpetual leases in question are valid. A review of the extensive evidence in the case indicates that Mr. Gutierrez exceeded his contracting authority under Organization Order No. 9 when he broke up the initial $22 million master lease for the Perpetual Building into nine separate leases, each of which was for less than $5 million. Mr. Gutierrez knew that the $22 million master lease required the approval of the Mayor or his designee, City Administrator Thomas Downs.[9] His motive in breaking the master lease into nine separate ones was to avoid this approval requirement. Division of the leases for budgetary reasons appears to have been merely an excuse by Mr. Gutierrez to avoid the $5 million limit on his contracting authority. This is particularly evident in light of the fact that there were two separate leases for the Department of Public Works, which if combined would exceed $5 million.

Angel Roubin, who signed the nine leases on behalf of Perpetual, knew or should have known that the master lease for over $22 million required the approval of the Mayor or the City Administrator. All of the leases signed by Mr. Gutierrez and Mr. Roubin specifically provided that "[t]he un-

dersigned Contracting Officer, or his alternate, has signed for the District of Columbia in accordance with the provisions of Organization Order Number 9, Mayor's Order No. 75–261, as amended, by Mayor's Order No. 84–54, [sic] executed this agreement in the name of the District of Columbia." (Exh. 1 to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction). Moreover, knowledge of the scope of the DAS Director's contracting authority is imputed to Perpetual. *See Heckler v. Community Health Services*, 467 U.S. 51, n. 17, 104 S.Ct. 2218, 2226 n. 17, 81 L.Ed. 2d 42, 54 n. 17 (1984); *Wilber National Bank v. United States*, 294 U.S. 120, 123–24, 55 S.Ct. 362, 363–64, 79 L.Ed. 798 (1935); *Coffin v. District of Columbia*, 320 A.2d 301 (D.C.App.1974). Thus, when Mr. Gutierrez submitted to Mr. Roubin seven separate leases, each for less than $5 million, Mr. Roubin should have been on notice of Mr. Gutierrez' efforts to circumvent the limits on his contracting authority. Although neither Organization Order No. 9 nor any other rule or regulation specifically prohibits division of leases which exceed $5 million, a finding that the Perpetual leases are valid, particularly in light of the evidence of Mr. Gutierrez' motive in breaking up the leases, would totally eviscerate the express limitation in Organization Order No. 9 on contracting officers' authority.

The Perpetual leases also contravene other requirements of Organization Order No. 9. The order provides that

B.(1) All contracts and change order [sic] shall be subject to the following:

(a) Certification by the Director of Finance and Revenue or his designee, that they are correct and proper for payment in the verified amount;

(b) Determination as to legal sufficiency in such manner as meets the requirements of the Corporation Counsel, D.C.....

Part II, B(1), Organization Order No. 9, Mayor's Order 75–261 (1975). Mr. Gutier-

9. By Mayor's Order 78–145 (1978), the Mayor delegated to the City Administrator the authority to approve contracts of the District of Colum-

bia in excess of $5 million as provided in Organization Order No. 9. (App. 16).

rez did not obtain the required certification by the Director of Finance and Revenue. Nor did he submit the contract to the Corporation Counsel to ascertain whether it met the requirements of that office. Perpetual argues that review by a DAS attorney satisfies this requirement. There is no persuasive authority for this position. Mr. Stone, who at that time was assigned to DAS, states that Mr. Gutierrez told him that the Corporation Counsel had no objection to having the legal sufficiency determination made by a DAS attorney. (Stone Dep., p. 24). On the same page of the Stone deposition, reference is made to grumbling by the Corporation Counsel's Office because that office felt that it could make a more adequate determination of legal sufficiency. Mr. Stone's deposition, at page 25, reflected that review by the Corporation Counsel's Office caused delay and sometimes comments about whether or not the lease was advantageous to the District of Columbia. Mr. Gutierrez was not pleased with this arrangement and this motivated him to direct that the legal sufficiency determination in cases in which his office was involved be made by one of his staff rather than the Corporation Counsel. Whatever Mr. Gutierrez' objections were, there is no satisfactory showing in the plaintiffs' papers that the requirement that a lease be submitted to the Corporation Counsel for determination of legal sufficiency could be changed as Mr. Gutierrez sought to change it. This is particularly true in such a case as we are confronted with here where the aggregate amount of the leases is $22.9 million.

### 3. Estoppel

Plaintiffs next argue that even if the nine Perpetual leases are invalid because Mr. Gutierrez exceeded his contracting authority, the District nevertheless is estopped from denying the validity of the leases. Plaintiffs seek to premise estoppel primarily on the City's delay in notifying it of its repudiation of the Perpetual leases because Mr. Gutierrez exceeded his contracting authority when he executed the leases on behalf of the District of Columbia. Specifically, Perpetual relies on six alleged government actions which Perpetual claims estop the District: (1) the District's oral representations to the Union Trust Bank regarding approval and execution of seven Perpetual leases; (2) the District's silence as to the validity of the leases after Mr. Downs himself determined in December that the Perpetual leases were invalid; (3) Mr. Downs' and the Mayor's receipt of a February 5, 1985 opinion by Corporation Counsel Inez Smith Reid regarding the Perpetual leases; (4) Mr. Gutierrez' March 1, 1985 execution of the tenant estoppel certificates; (5) the District's continued failure to disclose until May 17, 1985 that in December Mr. Downs ordered the Perpetual leases repudiated; and (6) the District's actual possession of the entire Perpetual building.

▮ The fundamental elements of estoppel are (1) a false representation or concealment of material facts; (2) the intention or expectation by the party to be estopped that the other party will act upon the representation or concealment; (3) knowledge of the representation or concealment by the party to be estopped; (4) ignorance of the true facts by the other party; and (5) reliance by the party seeking estoppel to his detriment. 3 J. Pomeroy, *Equity Jurisprudence* § 805, at 191–92 (5th ed. 1941); *accord, International Organization of Masters v. Brown*, 698 F.2d 536, 551 (D.C. Cir.1983) (quoting *Hoeber v. District of Columbia Redevelopment Land Agency*, 483 F.Supp. 1356, 1365–66 (D.D.C.1980), *aff'd mem.*, 672 F.2d 894 (D.C.Cir.1981)).

Reliance must be reasonable. As the Supreme Court explained in *Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), in which Community Health sought an estoppel against the government:

"If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligent on his part to remain ignorant by not using those means, he cannot claim to have been

misled by relying upon the representations or concealment."

104 S.Ct. at 2224 n. 10 (quoting 3 J. Pomeroy, *Equity Jurisprudence, supra,* § 810 at 219.)

 Chief Judge Aubrey Robinson, Jr. of this Court, in *American Savings v. Bell,* 562 F.Supp. 4 (D.D.C.1981), set forth clearly the traditional elements of estoppel as follows:

In addition to satisfying the traditional elements of estoppel, the theory may only be asserted against the government if the agent acting for the government was acting within the scope of his authority, an injustice has been perpetrated upon the party seeking the estoppel and when the public interest is not harmed by the application of estoppel in the particular context. Estoppel cannot rest on general notions of unfairness, but instead requires full satisfaction of all of the technical requirements.

*American Savings,* 562 F.Supp. at 9 (footnote omitted). *See generally* 3 J. Pomeroy, *Equity Jurisprudence, supra,* § 808a. The silence must amount to bad faith or negligence and the person remaining silent must know or have reason to know that his silence will induce another to alter his position. *E.g., Rainbow Commercial Alliance, Inc. v. Licciardi,* 89 Misc.2d 841, 393 N.Y.S.2d 140, 142–43 (Civ.Ct.N.Y.1976); *Traylor v. Gray,* 547 S.W.2d 644, 652 (Tex. Civ.App.1977); *see generally* 28 Am.Jur.2d *Estoppel* § 53 (1966). Thus, silence cannot be used as a basis for estoppel against a person who is seeking full knowledge of the facts. *Union Labor Life Insurance Company v. Parmely,* 270 Md. 146, 311 A.2d 24 (1973); *Victory Cab Company v. Churchill Downs, Inc.,* 312 Ky. 363, 227 S.W.2d 924 (1950); *see generally* 28 Am. Jur.2d *Estoppel* § 53.

 In addition to the above elements, when a party seeks estoppel against the government, the party seeking estoppel must establish a showing of an egregious injustice and lack of undue damage to the public interest. *International Organization of Masters v. Brown, supra,* 698 F.2d

at 551–52; *L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 564 F.2d 515, at 524 (D.C.Cir.1977); *Hoeber v. District of Columbia Redevelopment Land Agency, supra,* 483 F.Supp. 1356, 1365–66 (D.D.C. 1980). It is recognized, however, that the principles of equitable estoppel may apply to governmental bodies, particularly where the government has acted in a commercial or proprietary context, as in this case. *See Investors Research Corporation v. Securities and Exchange Commission,* 628 F.2d 168 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980); *see also District of Columbia v. Cahill,* 54 F.2d 453 (D.C.Cir.1931).

Plaintiffs have not demonstrated that they are likely to prevail on their estoppel claim. The evidence does not support a finding that the defendants acted in bad faith by failing to notify Mr. Roubin earlier of the District's repudiation of the Perpetual leases. Because the leases for the entire Perpetual Building exceeded $5 million, the approval of either Mr. Downs or the Mayor was required. Although Mr. Downs personally concluded in late December that the Perpetual Building leases were invalid, he did not want to take any action without first ascertaining all the facts and obtaining a legal opinion as to the validity of the leases. Likewise, the Mayor, who also had authority to approve the leases, did not wish to act precipitously. The Mayor appointed his special legal counsel, Dr. Herbert Reid, a distinguished professor of constitutional law at Howard University, to investigate whether Mr. Gutierrez' stewardship as DAS Director had been proper. As part of the investigation, Dr. Reid focused on the Perpetual lease transactions between Mr. Gutierrez and Angel Roubin. The Mayor understandably decided to withhold his decision on the Perpetual leases until Dr. Reid submitted his findings. The Mayor then acted promptly to notify Mr. Roubin of the District's decision to terminate the Perpetual leases.

Moreover, the evidence shows that plaintiffs did not reasonably rely on the defend-

ants' actions to their detriment. Even though the secrecy surrounding the revocation of Mr. Gutierrez' contracting authority in January 1985 is questionable, plaintiffs knew or should have known that the District Government had reservations about the validity of the leases. When Mr. Gutierrez signed the tenant estoppel certificates which expressly stated that the District was paying the rent due under the Perpetual leases, Perpetual knew that the District had not paid any rent under the leases even though a demand for payment was made.[10] After execution of the tenant estoppel certificates but before Perpetual and Mutual Benefit closed on the $15 million loan, sufficient facts were known to Perpetual that its continued reliance on the estoppel certificates or other representations by Mr. Gutierrez was unreasonable. The District had made no rental payments under the Perpetual leases and continued to refuse to make such payments. Indeed, by letter dated March 1, 1985, the same day Mr. Gutierrez signed the tenant estoppel certificates, the District informed Mr. Roubin that the City Administrator had ordered that no rent payments be paid pending resolution of some questions the City Administrator had about the leases. On March 20th, a week before the closing on the $15 million loan, the District instructed Mr. Roubin to suspend all work on design plans before any actual renovations took place. In addition, sometime before March 28th, Mr. Gutierrez met with Mr. Roubin to advise him that the District wanted the lease rate reduced substantially. Also, local news articles on March 23 and 26, 1985, disclosed the District's dissatisfaction with the Perpetual leases.

Prior to closing, Perpetual was under a duty to disclose to Mutual Benefit the numerous problems it was experiencing with the Perpetual leases. At the very least, Mutual also was aware of the District's failure to pay the rent, yet it proceeded to disburse $15 million to Perpetual.

Perpetual also argues that it relied to its detriment on the representations by a DAS employee to the Union Trust Company of Maryland that the District approved and executed the Perpetual leases and intended to occupy the Perpetual Building. At this early stage, neither the City Administrator nor the Mayor was even aware of the leases. Nor is there any evidence whatsoever of bad faith on the part of the District at this point in time.

Moreover, unlike other cases involving estoppel, the District Government did not accept any benefits under the contract under the Perpetual leases. *Cf. City of Nederland v. Callihan,* 299 S.W.2d 380 (Tex. Civ.App.1957); *Amarillo Oil Company v. Calvert,* 153 Tex. 193, 289 S.W.2d 746 (1954). The District occupied only two floors of the Perpetual Building pursuant to the October 1984 Rozansky and Kay lease at the rental rate of $18.25 per square foot.

Besides failing to satisfy the traditional elements of estoppel, the Court finds that plaintiffs have failed to show that the City's action, or inaction, resulted in egregious injustice and undue damage to the public interest. Accordingly, the Court finds that plaintiffs have failed to demonstrate a likelihood of success on its estoppel claim.

**B. *Irreparable Harm***

■ Mutual Benefit's contention that it will suffer irreparable harm without injunctive relief can be disposed of summarily. Under the terms of the deed of trust signed by Angel Roubin as general partner of Perpetual, Mutual Benefit can foreclose on the Perpetual Building in the event of default. Moreover, monetary injuries alone, however substantial, are insufficient to justify preliminary injunctive relief. *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958).

10. The only rent the District paid Perpetual was pursuant to the October 1984 lease for the sec-
ond and third floors of the Perpetual Building at the $18.25 per square foot rate.

Perpetual, however, has shown that it will likely suffer irreparable harms if the Court denies its motion for preliminary injunctive relief. Perpetual faces an imminent threat of foreclosure by Mutual Benefit, which would result in the loss of Perpetual's only asset, the Perpetual Building. Generally, destruction of a business constitutes irreparable harm sufficient to warrant the granting of a preliminary injunction provided the other three elements discussed in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir.1958), are met. *Wisconsin Gas Company v. Federal Energy Regulatory Commission*, 758 F.2d 669, —— (D.C.Cir.1985); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n. 2; *day Tours, Inc.*, 559 F.2d 841, 843 n. 2; *Art-Metal-U.S.A., Inc. v. Solomon*, 473 F.Supp. 1, 4 n. 4 (D.D.C.1978).

### C. *Public Interest and Balancing of the Equities*

Plaintiffs must also show that the granting of a preliminary injunction will advance the public interest. Plaintiffs fail to meet this burden. To saddle the taxpayers of the District of Columbia with substantial rental payments because of the conduct of one of its unfaithful servants would not be in the public interest. Preliminary injunctive relief would monetarily benefit one entity, Perpetual, at considerable expense to others, particularly where Perpetual proceeded to obtain a $15 million loan knowing of the substantial problems the District had with the leases, the nonpayment of rent, and Mr. Gutierrez' limited contracting authority. To find otherwise would result in pecuniary advantage to one individual at the expense of the integrity of the government's contracting process.

CONCLUSION

Although Perpetual is likely to suffer irreparable harm if preliminary injunctive relief is denied, consideration of the other factors weigh decidedly in defendants' favor. Perpetual has failed to show a likelihood of success on the merits, and the public interest would not be served by issuance of a preliminary injunction. Mutual Benefit's arguments for preliminary injunctive relief are even less compelling as it has shown no irreparable injury in the absence of injunctive relief. Accordingly, the Court denies plaintiff's motions for preliminary injunctive relief. This decision shall become effective on Friday, June 28, 1985 to allow adequate time to seek a stay and to appeal to the United States Court of Appeals for the District of Columbia Circuit.